# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RICHARD PISONI, et al., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No. 12-CV-678-SMY-DGW |
| STATE OF ILLINOIS, et al., | ) | (consolidated with 12-CV-755) |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for consideration of Defendant Illinois State Police's ("ISP") Motion for Judgment as a Matter of Law or, In the Alternative, For a New Trial (Doc. 162). Plaintiffs Richard Pisoni, Darren Lindsey and Mark Cameron brought this consolidated action alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (Doc. 53).

A seven-day jury trial was held beginning on September 5, 2017. The jury returned a verdict finding that ISP was liable to each Plaintiff for willful violations of the ADEA. ISP filed the instant motion, alleging that it was entitled to judgment as a matter of law because Plaintiffs had not proven that they suffered adverse employment action due to their age, had not demonstrated a basis for employer liability, had not proven compensable damages, and had not proven willfulness sufficient to support the jury's verdict. In the alternative, ISP requests a new trial due to an alleged instructional error. For the following reasons, the motion is **DENIED.**

## LEGAL STANDARD

Judgment as a matter of law may be entered where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue." FED. R. CIV. P. 50. In

determining whether the evidence presented at trial is sufficient to withstand such a motion, the district court may not weigh the parties' evidence, pass on the credibility of witnesses, or substitute its judgment of the facts for that of the jury. *Rivera v. Nash*, 1997 WL 570760, at *1 (N.D. Ill. Sept. 9, 1997). "A trial court should overturn a verdict only where the evidence supports but one conclusion—the conclusion not drawn by the jury." *Ryl–Kuchar v. Care Centers, Inc.*, 565 F.3d 1027, 1030 (7th Cir. 2009). Put another way, a jury verdict can be set aside "[o]nly when there is a complete absence of probative facts to support the conclusion reached[.]" *Harbin v. Burlington Northern R. Co.*, 921 F.2d 129, 131 (7th Cir. 1990). The court "views the evidence and all reasonable inferences in a light most favorable to the party who prevailed under the verdict." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

ISP's alternative motion for a new trial is governed by Rule 59(a). A new trial may be granted under Rule 59 if the verdict is against the manifest weight of the evidence or if a prejudicial error occurred. *Romero v. Cincinnati Inc.,* 171 F.3d 1091, 1096 (7th Cir. 1999). To win a new trial based on an erroneous jury instruction, a party must show both that the instructions did not adequately state the law and that the error was prejudicial to them because the jury was likely to be confused or misled. *Boyd v. Illinois State Police*, 384 F.3d 888, 894 (7th Cir. 2004) (citing *Gile v. United Airlines, Inc.*, 213 F.3d 365, 375 (7th Cir. 2000)).

## FACTUAL BACKGROUND

The pertinent evidence presented at trial is summarized as follows: Plaintiffs Richard Pisoni, Darren Lindsey and Mark Cameron were law enforcement officers employed by ISP on one of its Special Weapons and Tactics (SWAT) teams.[1] They were assigned to the South

---

[1] Unless indicated otherwise, these facts are taken from those stipulated by the parties and incorporated into the Final Pretrial Order (Doc. 124)

SWAT team, headquartered in Mount Vernon, Illinois. All members of South SWAT were provided with official state vehicles, were compensated for time driving to and from their homes, and were issued cell phones. Plaintiffs had been with SWAT or its predecessor Tactical Response Team ("TRT") since at least 1999, and each was over the age of 40 at all times relevant to this case.

Plaintiff Mark Cameron worked on the South SWAT team until approximately June 23, 2011. At that point, he held the rank of Acting Master Sergeant and was Assistant Team Leader. (Trial Transcript Day 2, Doc. 155 at 77-78).[2] When Cameron left SWAT, he reverted to his permanent rank of Sergeant with commensurately lower pay, although several temporary assignments elevated him back to Acting Master Sergeant. (Id. at 152). He retired from ISP in 2017. (Id. at 72).

Plaintiff Rich Pisoni also worked on South SWAT until June 23, 2011. At the time he transferred out of SWAT, he was a Sergeant and Squad Leader. He retired from ISP in April 2014. (Trial Transcript Day 3, Doc. 156 at 240).

Plaintiff Darren Lindsey was on South SWAT until July 29, 2011. He retired from ISP in July 2015. (Trial Transcript Day 4, Doc. 157 at 46).

During the relevant time period, Scott Koerner held the rank of Captain and was assigned to the Special Operations Command (SOCOM), which included commanding the North, Central, and South SWAT teams. Joe Kollins was the Acting Lieutenant of Operations at SOCOM in Springfield, Illinois during the relevant period, although he continued to routinely go on operations and train with South SWAT after December 16, 2010. From approximately 2005 to 2011, Greg Robinson was the training supervisor for the three SWAT units (North, Central, and

---

[2] The rank structure in the ISP is (from lowest to highest) Trooper, Sergeant, Master Sergeant, Lieutenant, Captain, Major, Lieutenant Colonel and Colonel. (Doc. 155 at 20-21).

South).  While he was the training coordinator assigned to SOCOM, the parties agree that Robinson did not "supervise" any members of South SWAT.

In 2010, South SWAT began to divide into two groups based on attitudes toward older members of the team.  (Doc. 155 at 93, 104).  The older group included Plaintiffs, who were all over 40 at the time.  (Id. at 105).  Plaintiffs and their witnesses testified that some of the younger SWAT operators, led by Trooper Charles Tolbert, began agitating for the older members of the team to be run off, largely through a plan of isolating and criticizing them.  (Id. at 106, 112).  Brian Holsapple and Steven Kerley testified that Tolbert stated that the "old guys" or "old bosses gotta go."  (Doc. 156 at 319, 358-59).  Younger members of the team who did not participate in this effort were ostracized.  (Docs. 155 at 105; 156 at 334-35; 157 at 532-33).  Cameron testified that after he learned of this concerted action, he raised the issue with Kollins on at least two occasions (and was present for a third), and that Kollins indicated he was aware of the plan and would talk with Tolbert about it.  (Doc. 155 at 113-116).

The younger group also began to circumvent the chain of command by airing grievances directly with more senior officials instead of submitting them to the older SWAT members who were direct superiors.  (Doc. 156 at 290-91, 375-76).  David Fitts, a former member of South SWAT, testified the custom and practice was that one did not "jump the chain of command unless it's absolutely dire emergency."  (Doc. 155 at 21).

On March 9, 2011, Lance Hinkle, one of the younger operators, violated safety procedures by grabbing Pisoni's gun barrel during an operation.  (Doc. 155 at 116).  At the resulting debrief, the issue was largely ignored in favor of complaints by younger operators that Pisoni was overwhelmed and needed to leave the team.  (Id. at 119-120).  After the briefing, Hinkle called Cameron and said he "feel[s] dirty about this."  (Id. at 120).

In late May, 2011, Cameron spoke with Kollins and Koerner regarding a "double standard for when older operators made mistakes versus when younger operators made mistakes" and the ongoing issues with the violation of chain of command. (Id. at 135).[3] They also asked that Tolbert be removed from the team. (Id.). Kollins refused. (Id.).

At a June 2, 2011 meeting between Clements, Cameron, Pisoni and Kollins, they discussed the complaints of South SWAT members that the older officers were not supporting a new and more physically-demanding training regimen. The suggestion was made that Clements and Cameron should observe, rather than participate in training. Pisoni requested that Tolbert be removed from South SWAT, and the request was again refused.

On June 15, 2011, Koerner and Kollins had a meeting with the operators of South SWAT, with Clements and Cameron excluded despite their requests to attend. On June 23, 2011, Cameron sent an e-mail to Koerner in which he indicated that because of blatant disrespect being demonstrated by some of the members of the team, he, Pisoni, and Team Leader Brian Clements wanted to be temporarily removed from South SWAT. He complained the unit had become nonoperational. Koerner had previously received a report that some younger members of South SWAT had acted inappropriately during a briefing. Cameron also sent an e-mail to ISP EEO Officer John Merrifield on June 23, 2011, stating that South SWAT should not be operational because it was unsafe. Also on June 23, 2011, Plaintiffs Cameron and Pisoni were transferred from South SWAT to District 13 patrol.

Plaintiff Lindsey notified Kollins on July 26, 2011 that he no longer wanted to be operational. He left South SWAT on July 29, 2011 for a temporary duty assignment with the Southern Illinois Enforcement Group.

---

[3] For example, younger operator Brian Dickmann had a negligent discharge of his firearm, which led Cameron to recommend his immediate "redlining" (being taken off live operations) for three months. (Doc. 155 at 103-104). Cameron was told that no such discipline would occur because Kollins would not allow it. (Id. at 209-11).

During trial testimony, there were numerous references to age-related negative comments having been made by members of South SWAT and other ISP personnel. Plaintiffs and non-party witnesses testified that the terms "old guys," "old bosses," "wheelgunners" and "shotgunners" (the latter two referring to the revolvers and shotguns that were issued when the older operators started versus modern semiautomatic weapons) were used in the South SWAT environment on a weekly basis. (Docs. 155 at 139-141; 156 at 368-69). Holsapple and Kerley recalled hearing "old need to go" on several occasions. (Doc. 156 at 330, 369). Brian Dickmann, one of the younger operators, voiced frustration that having Pisoni and Clements remain on the team was blocking promotion prospects. (Doc. 157 at 521-22). Robinson routinely referred to South SWAT members as "old guys" and "young guys." (Doc. 156 at 264-65, 356). Kollins allegedly stated that the intent was to make South SWAT a "younger, quicker team." (Doc. 156 at 306). Robinson voiced a similar desire to move to a "younger, more athletic team." (Doc. 157 at 511). On a number of occasions, Koerner stated some version of the phrase "SWAT ain't a retirement home" (Docs. 155 at 141; 156 at 332, 370-71, 471; 159 at 892). Koerner also created a picture of himself captioned "This ain't no retirement home" and displayed it prominently at one of the SWAT headquarters, even after he was aware that an age-discrimination complaint had been filed. (Docs. 156 at 370-72; 159 at 894, 902).

Each of the Plaintiffs testified regarding the damages they sustained as a result of being forced off of SWAT. Cameron testified that he had lost Acting Master Sergeant rank and its correspondingly higher pay rate. He gave an accounting of the difference between the pay he would have drawn as an Acting Master Sergeant and what he actually made based on the standard salary schedule. (Doc. 155 at 152; 157-161; 185-93). He also lost overtime wages, which are paid at a higher rate for higher ranks. (Id. at 194-97). He also testified that his

pension was lower as a result of retiring at the lower rank. (Id. at 197-98). He lost personal use of his official vehicle when he left SWAT, and he gave his estimated costs for using his own car based on the standard IRS mileage allowance. (Id. at 150-51; 200-02). Pisoni testified that he lost no wages, but was similarly "out of pocket" when he lost the benefit of a state vehicle and cell phone. (Doc. 156 at 479-83).

Lindsey testified that although he did not technically lose rank, he lost wages when he left SWAT because troopers on SWAT receive a higher "Agent" rate of pay. (Doc. 157 at 533-37). He estimated the cost of using his personal vehicle rather than the state vehicle he had while on SWAT. (Id. at 537-38). Finally, Lindsey testified about the lower retirement benefits he received due to his loss of agent status when he left SWAT. (Id. at 538-39).

The jury found in favor of Plaintiffs, awarding lost wages and benefits of $8,608 to Pisoni, $33,978.45 to Lindsey and $68,498.66 to Cameron. (Doc. 145). The jury also found ISP's violation of the ADEA to be willful and awarded Plaintiffs each liquidated damages equal to the amount of their lost wages and benefits. (Id.).

## DISCUSSION

### Erroneous Jury Instructions

ISP argues the jury instructions were deficient because they gave the jury the impression that ISP could be held strictly liable for a hostile work environment created by Plaintiffs' coworkers, rather than requiring that the jury find ISP was negligent in discovering or remedying the harassment in order to impose liability on it. The Court gave two instructions that identified the elements required for the jury to find liability. The first instruction was based on Seventh Circuit Pattern Civil Jury Instruction 3.01, modified to address the constructive demotion theory at issue in the case:

> Each Plaintiff claims that he transferred from his position with the SWAT team to a position with less pay and benefits because Defendant subjected him to harassment which created a hostile work environment that made his working conditions intolerable. This is called a "constructive demotion." To succeed on this claim, a Plaintiff must prove three things by a preponderance of the evidence:
>
> 1. Defendant made the Plaintiff's working conditions so intolerable that a reasonable person in the Plaintiff's position would have had to leave the position;
>
> 2. Defendant would not have made the Plaintiff's working conditions so intolerable had the Plaintiff not been over the age of 40 but everything else would have been the same; and
>
> 3. The Plaintiff would not have transferred from the SWAT team had he not been subjected to the age-based conduct creating intolerable working conditions.

(Doc. 144 at 20). The second instruction, a modification of Seventh Circuit Pattern Civil Jury Instruction 3.06, sets forth the standard for the jury to find whether Defendant's conduct was willful:

> If you find for a Plaintiff, you must then decide whether Defendant willfully violated the Age Discrimination in Employment Act as to that Plaintiff. To show this, each Plaintiff must prove by a preponderance of the evidence that Defendant knew that it was violating the Age Discrimination in Employment Act, or was indifferent to whether its actions violated the Age Discrimination in Employment Act, and not simply that Defendant was aware that it was engaging in age discrimination.
>
> If you find that Defendant willfully violated the Age Discrimination Employment Act as to a Plaintiff, then you must award that Plaintiff liquidated damages, which is an additional sum equal to the amount of lost wages and benefits you award.

(Id. at 23).

The liability provisions of the ADEA are generally interpreted according to the same standards as the parallel provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq*. *See Williams v. Banning*, 72 F.3d 552, 553–54 (7th Cir. 1995). An actionable hostile environment claim under

Title VII requires the plaintiff to prove: (1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability. *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005).

Whether there is a basis for employer liability turns on "whether the alleged harassment was perpetrated by supervisors or coworkers." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011). If the harasser was a supervisor, then the employer is strictly liable. *Id.* at 469–70. "When a plaintiff…claims coworkers *alone* were responsible for creating a hostile work environment, he must show that his employer has been negligent either in discovering or remedying the harassment." *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004) (quotation omitted) (emphasis added). Under Title VII, a supervisor is a person with "the power to directly affect the terms and conditions of the plaintiff's employment." *Jajeh v. Cty. of Cook*, 678 F.3d 560, 568 (7th Cir. 2012) (*quoting Andonissamy v. Hewlett–Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008). In *Jajeh*, the Seventh Circuit noted that "a supervisor will generally have the authority to hire, fire, promote, demote, discipline or transfer a plaintiff." 678 F.3d at 568 (quotation omitted). While these factors are indicia of supervisor status, an individual is not required to have any or all of these powers to be considered a supervisor. The key question is whether there is an imbalance of power between a harasser and their victim such that the former can intimidate the latter using the power with which the employer has entrusted them.

This case presents a somewhat different situation than those contemplated by the clean coworker/supervisor distinction. The evidence at trial indicated that Koerner and Kollins had disciplinary authority over South SWAT, including the ability to discipline and redline members

of the team. While Plaintiffs' teammates may have been the primary source of abuse, there was evidence that Koerner and Kollins contributed to the hostile atmosphere that Plaintiffs claim led them to quit SWAT and take lesser positions.[4] As such, this was not a pure coworker harassment case and it was not a pure supervisor harassment case; it was a hybrid where the superior officers' conduct was part of the overall pattern of hostility. Thus, the case as presented did not require that Plaintiffs make an additional showing of negligence on ISP's part, and the instructions were not erroneous for leaving out language suggesting such a requirement for liability.

Further, the jury's finding of willfulness suggests that even if a negligence instruction were appropriate, Defendant was not prejudiced by its exclusion. Willfulness under the ADEA means "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute[.]" *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 617, 113 S. Ct. 1701, 1710, 123 L. Ed. 2d 338 (1993). "A defendant's negligent mistake concerning the lawfulness of his conduct under the age discrimination law will not suffice to make that conduct willful[.]" *Price v. Marshall Erdman & Assocs., Inc.*, 966 F.2d 320, 324 (7th Cir. 1992). In order to find that the ISP knew or showed reckless disregard for whether its conduct violated the ADEA, the jury must necessarily have found that it was negligent in discovering or remedying the underlying harassment and more.

**Adverse Employment Action**

Defendant contends that it is entitled to judgment as a matter of law because Plaintiffs did not provide adequate proof of an adverse employment action against them. For Title VII

---

[4] During the first Formal Instruction Conference, the Court mistakenly stated that there had been "no allegation nor has there been any evidence of them [Koerner and Kollins] being directly involved in the conduct which plaintiff alleges constitutes harassment." (Doc. 159 at 927-928). Plaintiff's attorney made his record, and the following morning, the Court corrected itself by giving the instruction at issue.

purposes, there are three general categories of actionable, materially adverse employment actions: (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment. *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009).

The Seventh Circuit recognizes constructive demotion as a materially adverse employment action. See *Hicks v. Forest Pres. Dist. of Cook Cty., Ill.*, 677 F.3d 781, 787 (7th Cir. 2012). A constructive demotion is "when an employer has made conditions so unbearable that a reasonable person would have felt compelled to accept a demotion rather than remain in his current position." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 635 (7th Cir. 2013). For an atmosphere of harassment or hostility to be actionable, the offending behavior must be "sufficiently severe or pervasive to alter the victim's employment conditions and create an abusive working environment. A hostile-environment constructive discharge claim requires something more: working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 131 (2004).

Here, Plaintiffs presented sufficient evidence for a reasonable jury to conclude that they suffered a materially adverse employment action, and that the conditions were so intolerable that a reasonable person would have felt compelled to ask for a demotion. The jury heard evidence

about a number of actions and comments which could reasonably interpreted to show age-based animus against Plaintiffs, including Koerner's repeated comments regarding SWAT not being "a retirement home," comments about wanting to move toward a "younger, more athletic" or "younger, quicker" team by Kollins and Robinson, regular hostile comments about "old guys" and a concerted plan by Tolbert and other younger operators to isolate, undermine and drive off older operators. In an environment such as SWAT, where trust and group cohesion are essential to the safe conduct of an extremely dangerous job, a reasonable jury could find that Plaintiffs were subjected to a humiliating, degrading, unsafe, or unhealthful change in their work environment. These are questions for the finder of fact, and the Court will not substitute its own judgment as to how intolerable the environment was in South SWAT. Because there was sufficient evidence to support the jury's finding, the Court will not disturb their verdict.

### Basis for Employer's Liability

Defendant also moves for judgment notwithstanding the verdict because there was an inadequate basis for the jury to conclude that employer liability exists. As discussed above, the case presented was one where both supervisors and coworkers contributed to the hostile work environment. As such, Plaintiffs were not required to present evidence showing that supervisory employees of ISP were negligent in finding out or addressing the alleged harassment.

### Wilfullness

Defendant also claims there was inadequate evidence to support the jury's verdict finding that its conduct was willful. Willfulness for ADEA purposes requires a showing "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute[.]" *Hazen Paper Co.*, 507 U.S. at 617. "The word 'willful' is a chameleon, but as used in the ADEA, it is designed to shield the employer who violates the Act

without knowing it." *Shager,* 913 F.2d at 406 (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 129 (1985); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133-35 (1988); and *Coston v. Plitt Theatres, Inc.*, 860 F.2d 834 (7th Cir. 1988). An employee need not provide direct evidence of the employer's motivation in order to succeed in showing willfulness. *Hazen Paper Co.*, 507 U.S. at 617. There is "no rule requiring that the employer must have been actually contemplating the ADEA at the moment of the improper employment decision." *Smith v. Great Am. Restaurants, Inc.*, 969 F.2d 430, 435–36 (7th Cir. 1992). On the other hand, an employer is not in willful violation of the ADEA where it incorrectly but in good faith believes its conduct is not prohibited. *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 581 (7th Cir. 2003).

In this case, there was adequate evidence to support the jury's finding that Defendant was recklessly indifferent to whether the hostile work environment violated the ADEA. Testimony was adduced that Koerner had been informed there was age-related hostility growing among South SWAT, but continued to support the younger operators over the older ones and continued to actively contribute to the hostile atmosphere with his repeated proclamations that SWAT was not a "retirement home." He was so pleased with the sentiment that he used it as a caption on his own picture that he posted at one of the SWAT headquarters, and did so after he was aware that at least two of the Plaintiffs had filed complaints about age discrimination. (Doc. 159 at 902). A jury could reasonably conclude that this went beyond mere negligence or even knowledge in failing to address the older operators' concerns and crossed the line into reckless indifference.

**Compensable Damages**

The ADEA's enforcement system incorporates provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* See also *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 74

(2000) (stating that the ADEA "incorporates the FLSA's enforcement provisions, and that those remedial options operate together with § 626(c)(1)."). When a violation is found, the ADEA permits reinstatement, back pay, and other "legal or equitable relief as may be appropriate[.]" 29 U.S.C. § 626(b). The goal of compensation in an ADEA case "is to restore the employee to the position he or she would have been in absent the discrimination[.]" *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362 (1995). Courts have subsequently limited the relief available to exclude "compensatory damages for pain and suffering or emotional distress[.]" *Barton v. Zimmer, Inc.*, 662 F.3d 448, 454 (7th Cir. 2011) (citing *Comm'r of Internal Revenue v. Schleier*, 515 U.S. 323, 326 (1995)).

Defendant argues the jury's awards of back pay to Plaintiffs Cameron and Lindsey are not supported by the evidence because they made more money after they left South SWAT than when they had been on the team. But the question is not whether their compensation went up compared to what they had been making, but whether they were compensated less than they hypothetically would have made had the constructive demotion not occurred. Defendant's cross-examination of Cameron was at best equivocal on the issue; defense counsel asserted that Cameron made $25-50,000 a year more during his time "on the road" than when he was on South SWAT, but no evidence or testimony was introduced to counter Cameron's assertion that much of that was accounted for by the same step-raises and cost-of-living raises addressed in the hypothetical Master Sergeant calculation (Doc. 156 at 296-97). A reasonable jury could have found that Cameron's testimony regarding his losses for periods when he was no longer paid at a Master Sergeant rate was credible.

Lindsey testified that he managed to make up at least some of his lost wages by "putting more time and being away from [his] family more by working overtime." (Doc. 157 at 564).

Given the purpose of the ADEA's remedial provision to place a claimant back in the position they would have been absent the discriminatory conduct, it would be inequitable to essentially credit to Defendant for Plaintiff's willingness to put in significant additional time to make up the salary shortfall. Had he failed to do so, Defendant would no doubt have pled a failure to mitigate damages. A reasonable jury could have credited Lindsey's testimony regarding lost wages and chosen to award him back pay on that basis.

Plaintiffs each claimed some loss for expenses incurred in replacing the state-issued cell phone or vehicle usage. "[T]here is no doubt that a suit for fringe benefits denied on account of an employee's age is within the remedial scope of the age discrimination law." *Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 284 (7th Cir. 1993) (citing *Kossman v. Calumet County*, 849 F.2d 1027, 1032-33 (7th Cir. 1988) ("Amounts owing includes items of pecuniary loss or economic loss such as wages, fringe, and other job-related benefits.")). Damages for fringe benefits are not "compensatory damages" as excluded under *Moskowitz*.

Defendant draws a contrast between the use of a state-issued cell phone and/or vehicle with a "travel stipend." The plain language of the ADEA, FLSA and case law does not suggest that fringe benefits in the form of reimbursement should be treated differently that those provided in-kind, when the economic value of the latter is reasonably ascertainable. The Court finds no principled reason to make such a distinction. Personal use of state property is a benefit provided to SWAT operators, one that Plaintiffs lost when they were constructively demoted. As such, it was proper for the jury to award damages on that basis.

## CONCLUSION

For the foregoing reasons, Defendant Illinois State Police's Motion for Judgment as a Matter of Law or, In the Alternative, For a New Trial (Doc. 162) is **DENIED.**

**IT IS SO ORDERED.**

**DATED:  August 20, 2018**

                                                            **s/ Staci M. Yandle**
                                                            **STACI M. YANDLE**
                                                            **United States District Judge**